UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RANDY P. ZWOLAK, and
JOAN ZWOLAK,

                              Plaintiffs,

                v.

PHOENIX STEEL SERVICE, INC., and
P.I. AND I. MOTOR EXPRESS, INC.,

                              Defendants.

                                                          DECISION
                                                             and
                                                           ORDER

                                                      12-CV-00910F

                                                        (consent)

_____

PHOENIX STEEL SERVICE, INC.

                Third Party Plaintiff,

                v.

BAILEY MANUFACTURING COMPANY, LLC,

                Third Party Defendant.

_____


APPEARANCES:          LEWIS & LEWIS, P.C.
                      Attorneys for Plaintiffs
                      ALLAN M. LEWIS, of Counsel
                      37 Franklin Street
                      Suite 800
                      Buffalo, New York  14202

                      SUGARMAN LAW FIRM LLP
                      Attorneys for Defendant and Third Party Plaintiff
                        Phoenix Steel Service, Inc.
                      MICHAEL ANTHONY RIEHLER, of Counsel
                      1600 Rand Building
                      14 Lafayette Square
                      Buffalo, New York  14203

BURGIO, KITA & CURVIN
Attorneys for Defendant P.I. and I. Motor Company
HILARY C. BANKER, of Counsel
2150 Main Place Tower
350 Main Street
Buffalo, New York  14202-3734

BROWN & KELLY, LLP
Attorneys for Third Party Defendant
 Bailey Manufacturing Company, Inc.
KEVIN D. WALSH, of Counsel
1500 Liberty Building
Buffalo, New York  14202

## JURISDICTION

In this action, consents pursuant to 28 U.S.C. § 636(c)(1), to proceed before the

undersigned were filed on October 17, 2012, by Plaintiffs and Defendants (Doc. No. 7),

and on July 8, 2013, by Third Party Defendant (Doc. No. 29).  The matter is presently

before the court on motions for summary judgment filed by Defendant and Third Party

Plaintiff Phoenix Steel Service, Inc., on December 22, 2014 (Doc. No. 47), by Third

Party Defendant Bailey Manufacturing Company, LLC, on February 18, 2015 (Doc. No.

52), and by Defendant P.I. and I. Motor Express, Inc., on February 20, 2015 (Doc. No.

53).

## BACKGROUND

On June 11, 2012, Plaintiffs Randy P. Zwolak ("Zwolak") and his wife, Joan

Zwolak ("Mrs. Zwolak") (together, "Plaintiffs"), filed in New York State Supreme Court,

Chautauqua County ("New York Supreme Court"), a complaint alleging Zwolak suffered

personal injuries based on the negligence of Defendants Phoenix Steel Service, Inc.

("Phoenix"), the manufacturer and distributor of a coil of steel that on March 20, 2012,

fell on Plaintiff causing Plaintiff to sustain serious injuries.  In an amended complaint

("Amended Complaint"), also filed in New York Supreme Court, Plaintiffs name as

Defendants both Phoenix and P.I. and I. Motor Express, Inc. ("P.I. & I."), the motor

carrier that transported the steel coil from Phoenix to Zwolak's place of employment,

Bailey Manufacturing Company, LLC. ("Bailey").  Plaintiffs assert two claims for relief

including Zwolak's claim for negligence ("First Claim"), and Mrs. Swolak's derivative

claim for loss of services, companionship and consortium of her husband ("Second

Claim").  In its answer filed in New York Supreme Court (Doc. No. 2-4) ("P.I. and I.'s

Answer"),[1] P.I. and I. crossclaims against Phoenix for indemnification and contribution

should P.I. and I. be found liable to Plaintiff.  P.I. and I.'s Answer ¶ 25.  Likewise, in its

answer filed in New York Supreme Court (Doc. No. 2-5) ("Phoenix's Answer"),[2] Phoenix

crossclaims against P.I. and I. for indemnification and contribution should Phoenix be

found liable to Plaintiff.  Phoenix's Answer ¶ 14.

On September 25, 2012, P.I. and I. removed the action to this court citing

diversity as the basis of jurisdiction.[3]  On March 15, 2013, Phoenix filed a Third Party

Complaint (Doc. No. 19) ("Third Party Complaint"), against Bailey alleging claims for

contractual indemnification ("First Third Party Claim"), and breach of contract based on

Bailey's failure to procure insurance for the type of personal injuries alleged by Zwolak

("Second Third Party Claim").

On December 22, 2014, Phoenix filed a motion for summary judgment (Doc. No.

47 ("Phoenix's motion"), seeking dismissal of the Amended Complaint as against

---

[1] The record does not indicate on what date P.I. and I.'s Answer was filed in New York Supreme Court.
[2] The record does not indicate on what date Phoenix's Answer was filed in New York Supreme Court.
[3] Phoenix's joinder in the removal, dated September 19, 2012, is filed as Doc. No. 2-8.

Phoenix or, alternatively, granting Phoenix's third-party claim for contractual indemnification against Bailey.  Phoenix's motion is supported by the attached Statement of Material Facts Pursuant to Local Rule 56 (Doc. No. 47-1) ("Phoenix's Statement of Facts"), the Affidavit of Michael A. Riehler, Esq. (Doc. No. 47-2) ("Riehler Affidavit"), exhibits A through W (Docs. Nos. 47-3 through 47-26) ("Phoenix's Exh(s). __"), and the Memorandum of Law (Doc. No. 47-27) ("Phoenix's Memorandum").   On February 18, 2015, Bailey filed a motion for summary judgment on Phoenix's Third Party Claims (Doc. No. 52) ("Bailey's motion"), supported by the attached Affidavit of Kevin D. Walsh, Esq. (Doc. No. 52-1) ("Walsh Affidavit"), attaching as Exhibit 1 the Affidavit of John W. Hines (Doc. No. 52-2) ("Hines Affidavit").  On February 20, 2015, P.I. and I. filed a motion for summary judgment (Doc. No. 53) ("P.I. and I.'s motion"), seeking dismissal of the Amended Complaint as against P.I. and I. or, alternatively, requesting Phoenix's motion be denied.  P.I. and I.'s motion is supported by the attached Statement of Material Facts Pursuant to Local Rule 56 (Doc. No. 53-1) ("P.I. and I.'s Statement of Facts"), the Affidavit of Hilary C. Banker, Esq. (Doc. No. 53-2) ("Banker's Affidavit"), exhibits A through W (Docs. Nos. 53-3 through 53-26) ("P.I. and I.'s Exh(s). __"), and the Memorandum of Law (Doc. No. 53-27) ("P.I. and I.'s Memorandum").

In opposition to P.I. and I.'s Motion, Plaintiffs filed on March 20, 2015, a Memorandum of Law (Doc. No. 55) ("Plaintiffs' Memorandum"), attaching the Opposing Statement Pursuant to Local Rule 56 (Doc. No. 55-1) ("Plaintiffs' Opposing Statement of Facts"), the Affidavit of Emily F. Janicz, Esq. in Opposition (Doc. No. 55-2) ("Janicz's Affidavit"), and exhibits A through T (Docs. Nos. 55-3 through 55-22) ("Plaintiffs' Exh(s).

4

__"). On March 27, 2015, Phoenix filed the Reply Memorandum of Law (Doc. No. 56)

("Phoenix's Reply"), attaching the Affidavit of Peter A. Philbrick, Sr. (Doc. No. 56-1)

("Philbrick Affidavit").  On April 28, 2015, P.I. and I. filed the Reply Memorandum of Law

(Doc. No. 58) ("P.I. and I.'s Reply"), attaching the Affidavit of Brooks Rugemer (Doc. No.

58-1) ("Rugemer Affidavit").  By leave of the court granted August 12, 2015 (Doc. No.

63), Phoenix filed on August 28, 2015, the Supplemental Memorandum of Law (Doc.

No. 64) ("Phoenix's Sur-Reply"), attaching as Exhibit A the Affidavit of Peter Philbrick,

Sr. (Doc. No. 64-1) ("Philbrick Sur-Reply Affidavit").  Oral argument was deemed

unnecessary.

Based on the following, Phoenix's motion (Doc. No. 47), is GRANTED in part and

DISMISSED as moot in part; Bailey's motion (Doc. No. 52) is DISMISSED as moot, and

P.I. and I.'s motion (Doc. No. 53) is DENIED.


## FACTS[4]

Randy P. Zwolak ("Zwolak" or "Plaintiff"), was injured on March 20, 2012, while

unloading a delivery of twelve 11 ½ inch wide steel coils ("the steel coils"),[5] from the

back of a flatbed truck when one of the steel coils, weighing 5,000 lbs., tipped from a

standing position, striking Plaintiff, causing Plaintiff to fall off the truck and landing on

Plaintiff.  Plaintiff's employer, Third Party Defendant Bailey Manufacturing Company,

LLC ("Bailey"), located in Forestville, New York, had ordered the steel coils from

Defendant Phoenix Steel Service, Inc. ("Phoenix"), located in Cleveland, Ohio.  Bailey is

---

[4] Taken from the pleadings and motion papers filed in this action.
[5] The record indicates the steel coils were coils of sheet metal.  *See* Deposition of Bennie Ensley (Docs. Nos. 47-17; 53-17; 55-16), at 24, 28 (describing how steel coils commonly are "slitted" like a loaf of bread to make smaller, skinner or more narrow coils for shipping).

a stamping plant that manufactures mostly automotive parts, steering parts for Nexteer, and some parts for Carrier Air Conditioning, and such manufacturing required receiving and unloading deliveries of materials, especially coils of steel and aluminum.  *Id.* at 17-18.  The contract between Bailey and Phoenix dated June 19, 2009 ("the contract"),[6] governing the delivery of steel coils provided, in pertinent part, that

> Purchaser (*Bailey*) agrees to indemnify and hold harmless Seller (*Phoenix*) from and against all claims, demands, or actions regardless of legal theory, including the cost and expenses incurred in defense thereof, brought against Seller, whether based on an act, omissions, or negligence of Purchaser, or its agents, employees or customers, in connection with Purchaser's or its customer's subsequent sale, consumption or use of the Goods, or upon any defect in the Goods, caused by Purchaser, its agents, employees or customers.

Contract, Standard Terms and Conditions for Sale of Goods, ¶ 12. Indemnification ("indemnification provision").

The steel coils were, pursuant to Bailey's shipping instructions, shipped on a delivery truck ("the truck"), driven by Richard Wilson ("Wilson"), for Defendant P.I. and I. Motor Express, Inc. ("P.I. and I.").  The truck consisted of a cab with a flatbed trailer ('the flatbed") with sides ("the sides") that folded down allowing access to the flatbed for loading and unloading.  Removable ribbing ("the ribbing") was attached to one of the flatbed's sides, extending across the flatbed to the other side supporting a tarp ("the tarp") that covered the flatbed.  To allow for proper weight distribution over the truck's axle, the steel coils were to be shipped with a row of four coils standing in the front of the flatbed, a row of four coils lying "skidded" on pallets ("the skidded coils"), and another row of four coils standing in the back of the flatbed ("the standing coils" or "the unskidded coils").[7, 8]

---

[6] Phoenix's Exh. S.
[7] The "front" of the flatbed refers to the part closest to the cab, and the "rear" or "back" of the flatbed refers to the part farthest from the cab.

In preparation of shipping the steel coils, Wilson, on March 19, 2012, backed the truck into Phoenix's facility, removed the tarp from the ribbing and folded down the sides. Wilson then placed on the floor of the flatbed a coil rack ("coil rack"), consisting of a metal bracket with 4 X 4 wooden timbers ("the timbers") placed inside the bracket to hold the coils in place. The metal brackets prevent the timbers from moving. The timbers measured six to eight feet in length and each has a beveled edge to support and stabilize the coils during transport. When standing, the coils sit in the coil rack and do not touch the flatbed's floor. Placement in a coil rack is the typical manner for shipping steel coils standing with the "eye to the side." Once the coils are standing in the coil rack with their 'eyes' to the side, a chain is run through the eyes of the coils to the floor of the truck using ratchet binders to further secure the coils to the flatbed. The 11 ½" coils Bailey had requested be loaded onto the flatbed in a standing position with the eye to the side were also to have 2 " wooden spacers between them as per Bailey's request. The spacers prevented the coils from becoming entangled with each other and would allow Bailey, whose crane did not have the capacity for unloading all four standing coils at the same time, to unload each of the standing coils one at a time.

In preparing the four coils to be loaded onto the coil rack, Phoenix ran a band around the circumference of each coil to keep the coil intact. The banded coils were then banded together into sets of two, and the two sets of two banded coils were further banded together into one set of four coils. Between each of the four coils Phoenix placed the 2" spacers. One Bennie Ensley ("Ensley") of Phoenix, using an overhead crane fitted with a C-hook, then lifted at the same time all four coils, banded together

---

[8] Although the steel coil shipment at issue contained more than four coils, the court's reference to the "standing coils," "coil row" or the "coil rack" refers to the set of four coils placed at the back of the flatbed, containing the steel coil that struck Plaintiff.

with spacers in between and, at Wilson's direction, placed the coils in a standing

position with their eyes to the side on the coil rack on the floor of the flatbed.  One of the

coils in the rear coil rack, however, was not completely positioned inside the coil rack

but extended beyond the end of the timbers so that several inches of the coil were not

supported by the coil rack.  Wilson then threaded a chain through the eyes of the

standing coils, fastening the chain to the floor of the flatbed with the ratchet binders to

secure the standing coils.  Wilson replaced the truck's sides, ribbing, and tarp, then

drove the truck to his home for the night.  The next morning, March 20, 2012, Wilson

drove the truck, with its load of steel coils, to Bailey's manufacturing facility ("Bailey's

facility"), in Forestville, New York, stopping twice en route to check the condition of the

load and that the chains were secure.  During the second stop, Wilson had to make a

small adjustment to one of the chains.  Wilson drove the truck to Bailey's facility without

any incident.

Upon arriving at Bailey's facility, Wilson parked the truck in the yard and checked

in with Plaintiff who, as Bailey's warehouse lead, was responsible for unloading

shipments of steel coils at Bailey's facility.  Bailey's quality control person Cheryl Ludlow

("Ludlow"), performed a quality check on the coils to make sure they were what Bailey

had ordered, but did not notice any issues with the manner in which the coils were

placed in the coil rack.  Wilson then backed the truck into the loading dock, removed the

truck's tarp and ribbing, and folded down the sides in preparation for Plaintiff to unload

the steel coils from the flatbed by overhead crane.  Wilson next unchained the skidded

coils which were to be removed from the flatbed by forklift after the rear row of standing

coils was unloaded.

Meanwhile, Plaintiff prepared to unload the standing coils one at a time from the coil rack using an overhead electric winch or crane mounted to a beam on the warehouse's ceiling that allowed the crane to be moved into the position necessary to unload trucks.  Plaintiff positioned the crane slightly behind the last row of standing coils.  Plaintiff did not observe any problem with the manner in which the four standing coils sat in the coil rack and cut the bands holding the coils together before affixing the overhead crane's chain to the coil, although nothing prevented Plaintiff from doing so.  Cutting the banding on the coils released the tension allowing the coils to open up or move an inch or two away from each other.  Plaintiff cut the band holding the coils together on the driver's side of the flatbed which side was closest to the facility's load dock, walked in front of the eye of the coil and then cut the band on the other side.  As Plaintiff was walking back past the coil's eye, heading toward the crane controls at the loading dock, the coil at the end of the coil rack nearest the loading dock, the same coil that was not completely supported by the coil rack, began to tip off the coil rack.  Plaintiff attempted to stop the coil from falling by grabbing the coil and bracing himself on the loading dock's wall beside the flatbed, but the weight of the coil was too great and the coil continued to fall, striking Plaintiff, knocking Plaintiff off the flatbed and falling on Plaintiff.  As a result of the accident, Plaintiff was seriously injured and has been unable to resume working for Bailey or any other job.

## DISCUSSION

**1.     Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any

source from which a reasonable inference in the non-moving party's favor may be

drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322;

*see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a

material fact is "genuine," that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party").  "A fact is material if it 'might affect the

outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35

(2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide

district courts in their determination of summary judgment motions."  *Brady v. Town of*

*Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Defendant Phoenix moves for summary judgment arguing that under relevant law, Phoenix cannot be held liable for Plaintiff's injuries. Phoenix's Memorandum at 5-11. Alternatively, Phoenix seeks summary judgment on its Third Party Claim against Bailey for contractual indemnification, *id.* at 11-12, on which Bailey also seeks summary, arguing the contract's indemnification provision is inapplicable to Plaintiff's accident. Walsh Affidavit ¶¶ 8-14.

P.I. and I. argues in support of summary judgment that once P.I. and I. unchained the steel coils for unloading by Bailey, P.I. and I.'s duty with regard to the steel coils was complete and without incident, P.I. and I.'s Memorandum at 9-10, and that the accident was caused solely by the actions of Plaintiff, who neglected to attach the overhead crane's chain to the steel coil prior to cutting the banding, as well as to Bailey for failing to properly train Plaintiff in that regard. *Id.* at 10-12. Alternatively, P.I. and I. argues that if a question of fact exists as to P.I. and I.'s liability, then there

necessarily exists a question of fact as to Phoenix's liability.  *Id*. at 12-14.  In opposition

to P.I. and I.'s motion, Plaintiff argues that three issues of triable fact preclude summary

judgment in P.I. and I.'s favor, Plaintiff's Memorandum at 6-10, and, alternatively, that

Phoenix is entitled to contractual indemnification by Bailey.  *Id*. at 10-11.

In further support of summary judgment, P.I. and I. maintains that Plaintiff has

failed to point to any issue of fact establishing P.I. and I. had any duty toward Plaintiff

once the steel coils were safely transported to Bailey's facility, P.I. and I.'s Reply at 2-7.

P.I. and I.'s expert Brooks Rugemer ("Rugemer"), a commercial trucking specialist

associated with Robson Forensic, Inc., asserts that Phoenix had a duty to Plaintiff

because Phoenix is often the motor carrier of its own products.  Rugemer Affidavit ¶ 8.

Phoenix denies the fact that Phoenix maintains its own fleet of trucks is sufficient to shift

to Phoenix responsibility for securing products loaded onto P.I. and I.'s truck.  Phoenix's

Sur-Reply at 2.

## 2.    Applicable Law

Because this matter is before the court pursuant to diversity jurisdiction, the court

applies the substantive law of the state whose law governs the action.  *Erie. R.R. Co. v.*

*Tompkins*, 304 U.S. 64, 78 (1938).  The accident for which Plaintiff sues occurred in

New York and, as such, New York law applies.  *Lee v. Bankers Trust Co.*, 166 F.3d

540, 545 (2d Cir. 1999) (in tort action, New York law generally applies the law of the

place of the tort).  As relevant, New York law provides that "a plaintiff must establish

three elements to prevail on a negligence claim: '(1) the existence of a duty on

defendant's part as to the plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff

as a result thereof.'"  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)

(quoting *Akins v. Glen Falls City School District*, 424 N.E.2d 531, 535 (N.Y. 1981)). "The existence of a duty is thus a *sine qua non* of a negligence claim: 'In the absence of a duty, as a matter of law, no liability can ensue.'"  *Id.* (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997); and citing *Strauss v. Belle Realty Co.*, 582 N.E.2d 34, 36 (N.Y. 1985) ("A defendant may be held liable for negligence only when it breaches a duty owed to the plaintiff.")).  As such, "[t]he question of the existence and scope of an alleged tortfeasor's duty 'is, in the first instance, a legal issue for the court to resolve.'" *Id.* (quoting *Waters v. New York City Housing Authority*, 505 N.E.2d 922, 923 (N.Y. 1987)).

Under applicable New York law, "where a carrier has the opportunity to observe an obvious defect in the loading of materials, it has a duty to either correct the defect or at least warn others who might be affected."  *Sprague v. Louis Picciano, Inc.*, 474 N.Y.S.2d 591, 595 (3rd Dep't.) (citing 17 NY Jur 2d, Carriers, § 286, pp 341-42, and contrasting *Lewis v. N.Y., Ontario & Western Ry. Co.*, 104 N.E. 944) (N.Y. 1914)), *leave to appeal denied by* 467 N.E.2d 895 (N.Y. 1984).  In *Sprague*, the trial court's grant of summary judgment to a truck driver who transported a shipment of pipes that was improperly loaded without spacers being placed between two tiers of the pipes was reversed.  *Sprague*, 474 N.Y.S.2d at 251.  According to the Appellate Division, although there was no evidence that the truck driver was negligent in the actual loading or unloading of the pipe, a question of fact existed as to whether the truck driver breached a duty to the plaintiff to perceive and warn of the improperly loaded materials.  *Id.*

The federal rule on which the parties rely, Phoenix's Memorandum at 8-11; P.I. and I.'s Memorandum at 13-14; Phoenix's Reply at 8-9, is not inconsistent, providing that

> The primary duty as to the safe loading of property is [ ] upon the carrier.  When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.  This rule is not only followed in cases arising under the federal statutes by decisions of the federal courts but also for the most part by the decisions of the state courts.

*United States v. Savage Truck Line*, ("*Savage*"), 209 F.2d 442, 445 (4th Cir. 1953), *cert. denied*, 347 U.S. 952 (1954) (citing cases).

Although the Second Circuit Court of Appeals and New York courts have not commented on *Savage*, at least two district courts within the Second Circuit have followed *Savage* as stating the applicable duty of a shipper under New York law.  *See*, *e.g.*, *Yoos v. Better Life Technology*, LLC, 2012 WL 177867, at ** 4-5 (N.D.N.Y. Jan. 23, 2012) (diversity action holding defendant shipper owed a duty of care to plaintiff carrier where evidence established issues of fact as to whether there were latent defects regarding how defendant loaded cargo into a container that was later placed onto truck driven by plaintiff and which truck overturned when the cargo shifted); and *Ebasco Services, Inc. v. Pacific Intermount Express Company*, 398 F.Supp. 565, 568-69 (S.D.N.Y. 1975) (denying summary judgment as to motor carrier's indemnity claim against shipper with respect to liability for damages to shipment caused by shipment's excessive height because questions of fact existed as to whether the shipper's employees represented to the carrier's driver that the load was of a proper height and as to whether the excessive height was observable or a latent defect).  Thus, under

both New York law, as stated in *Sprague*, and federal law, as stated in *Savage*, the carrier can be held liable for an obvious or apparent defect in loading.

Further, the governmental agency charged with oversight of the operation of motor carriers on the roadways of the United States is the Federal Motor Carrier Safety Administration ("FMCSA") which has promulgated regulations to be followed by motor vehicle carriers.  As relevant to the instant case, 49 C.F.R. § 392.9 ("§ 392.2") provides that "[a] driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless – (1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100 through 393.136 of this subchapter."  Specifically, when transporting one or more metal coil weighing 5,000 pounds or more, in a standing position with the eye to the side, each coil must be secured by

> A means (e.g., timbers, chocks or wedges, a cradle, etc.) to prevent the coil from rolling.  The means of preventing rolling must support the coil off the deck, and must not be capable of becoming unintentionally unfastened or loose while the vehicle is in transit.  If timbers, chocks or wedges are used, they must be held in place by coil bunks or similar devices to prevent them from coming loose.  The use of nailed blocking or cleats as the sole means to secure timbers, chocks or wedges, or a nailed wood cradle, is prohibited.

49 C.F.R. § 393.120(c)(1)(i) ("§ 393.120").

At least one tiedown through the steel coil's eye must be used to restrict the coil against forward and rearward motion.  49 C.F.R. § 393.120(c)(1)(ii) and (iii).[9]

### 3.     Phoenix's Motion

Defendant Phoenix moves for summary judgment arguing that under the relevant Federal Motor Carrier Safety Regulations and prevailing caselaw, Phoenix cannot be

---

[9] The placement of the steel coils in the coil rack with their eyes to the side and a chain running through the eyes and secured to the flatbed ostensibly complied with §§ 392.9 and 303.120, and the parties do not argue otherwise.

held liable for Plaintiff's injuries. Phoenix's Memorandum at 5-11. Phoenix alternatively seeks summary judgment on its Third Party claim against Bailey for contractual indemnification. *Id.* at 11-12. P.I. and I. argues that whether Plaintiff opposes Phoenix's motion is irrelevant to P.I. and I.'s crossclaims against Phoenix, P.I. and I.'s Reply at 1-2, and maintains that because Phoenix is often the motor carrier of its own products, Phoenix "is in the unique position to immediately identify if an outside carrier (such as P.I. and I.) isn't using proper securement devices and procedures." Rugemer Affidavit ¶ 8. As such, based on its "in-house expertise and know-how," that Phoenix allowed the load of steel coils to leave its facility establishes there was no apparent problem with the manner in which the coils were loaded and transported. *Id.* Phoenix argues the fact that Phoenix is also a motor carrier should not subject Phoenix to any enhanced duty to Plaintiff to make sure the steel coils were properly loaded onto P.I. and I.'s flatbed, and Rugemer's opinion in that regard is contrary to the Federal Motor Vehicle Safety Act which governs the transportation of products and commodities on interstate highways. Phoenix's Sur-Reply at 2.

Significantly, P.I. and I. does not dispute that there is no evidence the steel coils shifted or moved during their transport from Phoenix to Bailey's facility. P.I. and I.'s Memorandum at 13 ("There is no evidence whatsoever that these steel coils shifted or moved or indeed had any issue whatsoever during transport."). Rather, according to P.I. and I., "[t]he only issue arose when the bands were cut, which bands were placed there by PHOENIX." *Id.* As such, P.I. and I. maintains that any claim regarding the steel coil's placement on the coil racks is against Bailey who required the steel coils be

shipped on coil racks, and Phoenix would necessarily bear some responsibility for how the steel coils were loaded.  *Id*. at 13-14.

As discussed, Discussion, *supra*, at 13-14, under both New York and federal law, the carrier can be held liable for an obvious or apparent defect in the loading of materials.  *Sprague*, 474 N.Y.S.2d at 251; *Savage*, 209 F.2d at 445.  Although under federal law, only when the shipper assumes responsibility for loading the carrier does the shipper become liable for latent defects in the loading, *Savage*, 209 F.2d at 445, if the improper loading is apparent, *i.e.*, can "be discerned by ordinary observation by the agents of the carrier," the carrier will be liable for any harm attributed to such defect regardless of the shipper's negligence.  *Id*.  In the instant case, the undisputed facts establish that Phoenix, as the shipper of the steel coils, shipped the steel coils according to Bailey's specifications and without any latent defect such that Phoenix cannot be held liable for Plaintiff's injuries.

In particular, Bailey's Packaging Specifications ("Packaging Specifications")[10] indicates that 11 1/2" wide materials are to be shipped "eye to the side with 2" spacers between coils."  The Packaging Specifications do not indicate that any other materials are to be shipped in the same manner, or "eye" to the side without spacers.  *Id*.[11]

Joseph Williams ("Williams"), who, as Phoenix's Executive Vice President, Director of Plant Operations, is responsible for safety, testified that Phoenix shipped

---

[10] Filed as Phoenix's Exh. U. and P.I. and I.'s Exh. U.

[11] The court notes that in Bailey's Purchase Order dated May 1, 2012, filed as Phoenix's Exh. R and P.I. and I.'s Exh. R. ordering from Phoenix steel coils including 11 ½" wide coils with an outside diameter between 46" and 50", and weighing between 4,000 lbs. and 5,300 lbs. are to be shipped "eye to the sky." The pricing for this Purchase Order indicates the pricing is in effect "from 4/1/12 – 6/30/12" and that the coils would be "packaged per Bailey Specifications – FORM 74-02-05-B." The separately filed Packaging Specifications for this case, however, are "Form 74-02-05-A." Packaging Specifications. This Purchase Order thus does not pertain to the shipment of coils at issue in this action and the court does not further consider it.

steel coils either standing or skidded according to the customer's specifications which were typically based on the customer's material handling capabilities for unloading. Williams's Dep. Tr. [12] at 5, 7, 13-15.  Material handling capabilities included a coil's inside or eye diameter, outside diameter, width, and weight.  *Id.* at 15-16.  Purchase orders often specified spacers were to be placed between each coil to prevent the coils from banging into each other and sticking together.  *Id.* at 23-24.  To keep the spacers in place between two coils, the coils were banded together.  *Id.*  The only way to safely ship standing coils was with use of a coil rack.  *Id.* at 24.

Phoenix employee Bennie Ensley ("Ensley"), who, on March 19, 2012, worked in Phoenix's shipping and receiving department where his job duties included loading steel coils onto the flatbed trailer, Ensley Dep. Tr.[13] at 10-11, explained that the truck driver would prepare the truck for loading, including taking down the truck's sides to open up the flatbed for loading the materials to be shipped, and providing the coil rack which the truck driver places on the floor of the flatbed.  *Id.* at 10-11, 14-15.  Because the truck driver is responsible for apportioning the weight of the load throughout the truck, the truck driver decides where on the flatbed to place the coil rack, and Ensley had no input into that decision, although Phoenix is responsible for how the steel coils are to be packaged, *i.e.*, banded together with spacers.  *Id.* at 13-15, 41-42, 50-51.  Once the truck driver places the coil rack into the desired position, the truck driver than directs the crane operator, here, Ensley, where on the flatbed and in what order the steel coils should be loaded.  *Id.* at 16, 41.  The truck driver indicates with hand signals precisely

---

[12] References to "Williams's Dep. Tr." are to the page of the transcript of Joseph William's deposition, filed as Phoenix's Exh. M, P.I. and I.'s Exh. M, and Plaintiffs' Exh. M.

[13] References to "Ensley's Dep. Tr." are to the page of the transcript of Bennie Ensley's deposition, filed as Phoenix's Exh. N, P.I. and I.'s Exh. N, and Plaintiffs' Exh. M.  The record does not definitively state that Ensley was the Phoenix employee who loaded the steel coils onto the flatbed on March 19, 2012.

where the steel coils are to be placed in the coil racks, with the truck driver standing on the flatbed to ensure the steel coils are placed in accordance with the truck driver's directions. *Id.* at 17-18, 41, 51-52, 53, 55. Ensley never enters the bed of a truck during the loading process. *Id.* at 19, 41. Once all the coils are loaded, the truck driver secured the coils with chains, then replaces the truck sides, ribbing and tarp. *Id.* at 19, 49. Ensley does not inspect the chains or bands after the truck is loaded. *Id.* at 19.

Ensley explained that because some customers, including Bailey, do not own unloading equipment that can lift full-size coils, larger coils were often "slitted" or cut down into smaller, more narrow coils. Ensley Dep. Tr. at 24. The "slitter" cuts the larger coils cross-wise, like a loaf of bread, then places black bands around the circumference of the resulting narrower coils to hold them together. *Id.* The load capacities of Phoenix's four cranes ranged from 38,000 lbs. to 60,000 lbs., permitting Ensley to lift all four banded coils at one time. *Id.* at 46. Because Phoenix had loading equipment that could lift all four slitted coils, two slitted coils would be banded together into a set, and then the set of two banded coils would be further banded together with another set of two banded coils for a total of four banded coils, which Ensley would lift altogether with the crane onto the coil rack of P.P. and I.'s flatbed. *Id.* at 25-26, 46. Ensley confirmed that the truck driver does not place the 2 X 4 wooden spacers between the slitted coils, nor perform any of the banding of the slitted coils. *Id.* at 26.

P.I. and I.'s truck driver, Wilson, testified at his deposition that he made the determination that the four skidded coils, "eye" to the sky, would be placed on the flatbed between the two rows of unskidded or standing steel coils, and that such placement was intended to ensure even weight distribution over the truck's axle. Wilson

Dep. Tr.[14] at 46-47, 49, 121-22.  When Wilson arrived at Phoenix's loading dock to pick up the steel coils, Wilson had already placed the two coil racks on the flatbed.  *Id.* at 47, 50.  Wilson received no assistance from Phoenix in placing the coil racks on the flatbed.  *Id.* at 50.  The coil racks, which were owned by P.I. and I., were not actually connected to the flatbed, but could be moved.  *Id.*  Phoenix then used a crane to lift the steel coils and place them onto the flatbed, including onto the coil racks, in accordance with Wilson's directions.  *Id.* at 51-52.  Wilson admitted he determined where each standing steel coil would be placed in the coil racks.  *Id.* at 56-57.  When placed inside the coil racks, the steel coils did not touch the deck of the flatbed, but were suspended inside the coil rack approximately ¼ inch above the deck.  *Id.* at 131-32, 156.  After the steel coils were loaded onto the flatbed, Wilson then secured the coils by threading chains through the eyes of the coils chains and hooking the chains on both sides of each row of standing coils to ratchet binders on the floor of the flatbed.  *Id.* at 52-56, 125.  Wilson then checked that the coils were secure and that the coil racks with the 4 X 4 timbers, exceeded the width of the coils placed inside them.  *Id.* at 139-40.  Once the steel coils were secured by the chains, Wilson covered the load, putting up the truck's sides, ribbing and tarp before driving the truck toward its destination the next day.  *Id.* at 56, 58-59.

Wilson explained that he made two stops during the trip to Bailey's facility, checking at each stop that the load was secure.  Wilson Dep. Tr. at 56, 59-60.  At the first stop, which Wilson recalled was in Pennsylvania, the chains were not loose so Wilson did not need to adjust any chains to secure the load.  *Id.* at 60.  During Wilson's

---

[14] References to "Wilson Dep. Tr." are to the page of the transcript of Wilson's deposition, filed as Phoenix's Exh. K, P.I. and I.'s Exh. K, and Plaintiffs' Exh. K.

second stop, however, which was in New York State, Wilson observed that a couple of

the chains "were just a little loose" requiring Wilson to crank or ratchet the chains to fully

secure the load.  *Id.* at 61-62.

The record is thus devoid of any evidence that anyone other than P.I. and I. was

responsible for ensuring the steel coils were loaded onto the flatbed according to

Baileys' Packaging Specifications and in accordance with P.I. and I.'s directions by

Wilson, the truck driver.  Phoenix would thus be liable only for latent defects in the

loading, *i.e.*, defects that would not be discernable by ordinary observation by agents of

the carrier.  *Savage*, 209 F.2d at 445.  As discussed below, however, Discussion, *infra*,

at 29-36, there is no evidence of any latent defect in the manner in which the steel coils

were loaded, but there is evidence of an obvious defect of which P.I. and I. was required

to warn Plaintiff: that the unskidded steel coil that tipped and fell on Plaintiff was not fully

supported by the coil rack and, thus, was more prone to tipping off the coil rack when

the bands that connected the steel coils together were cut.  Such evidence of improper

loading that is discernable by ordinary observation by the carrier's agent could be found

by a trier of fact sufficient to hold P.I. and I. liable for any harm attributed to such defect

regardless of the shipper's negligence.  *Id.*

Nor does the fact that Phoenix maintains its own fleet of trucks which Phoenix

often uses to transport its products require finding that Phoenix can be held liable as the

carrier in the instant action, a proposition for which P.I. and I. points to no legal authority

in support but, instead, relies on the bald and conclusory statement of Rugemer, P.I.

and I.'s expert.  P.I. and I. points to no caselaw supporting this novel idea, and the

court's research reveals none.  Simply put, Phoenix was not the carrier of the steel coil which tipped and struck Plaintiff.

Phoenix's motion is thus GRANTED as to the request for summary judgment on Plaintiff's claims, and is DISMISSED as moot with regard to Phoenix's alternative request for summary judgment on its Third Party claims against Bailey.

**4.     Bailey's Motion**

Bailey seeks summary judgment on Phoenix's indemnification Third Party Claim, arguing the contract's indemnification provision is inapplicable to Plaintiff's accident because it did not occur or arise out of the sale, consumption or use of the steel coil sold by Phoenix.  Walsh Affidavit ¶¶ 8-14.  The granting of Phoenix's motion, however, renders Bailey's motion moot.  Accordingly, Bailey's motion is DISMISSED as moot.

**5.     P.I. and I.'s Motion**

P.I. and I. argues in support of summary judgment that P.I. and I. was required to comply only with the load securement regulations promulgated by the FMCSA such that once P.I. and I. had safely delivered the load of steel coils to Bailey's facility and Bailey took control of the shipment for unloading, P.I. and I.'s responsibility for the shipment ended such that P.I. and I. owed no duty to Plaintiff.  P.I. and I.'s Memorandum at 6-8. Further, P.I. and I. fully complied with Bailey's specifications in loading the steel coils, P.I. and I.'s Memorandum at 8-9, it was Phoenix who banded the steel coils together, *id.*, and once P.I. and I. unchained the steel coils for unloading by Bailey, P.I. and I.'s duty with regard to the steel coils was complete and without incident.  *Id.* at 9-10.  P.I. and I. further maintains the accident was caused solely by the actions of Plaintiff, who neglected to attach the overhead crane's chain to the steel coil prior to cutting the

banding, as well as to Bailey for failing to properly train Plaintiff in that regard.  *Id.* at 10-12.  Alternatively, P.I. and I. argues that if a question of fact exists as to P.I. and I.'s liability, then there necessarily exists a question of fact as to Phoenix's liability.  *Id.* at 12-14.  In opposition to P.I. and I.'s motion, Plaintiff argues that three issues of triable fact preclude summary judgment in P.I. and I.'s favor, including whether P.I. and I. owed Plaintiff a duty, Plaintiff's Memorandum at 6-7, whether P.I. and I. properly loaded and secured the steel coils it transported to Bailey, *id.* at 7-8, and whether Plaintiff's action were the sole proximate cause of the accident.  *Id.* at 8-9.  In further support of summary judgment, P.I. and I. argues Plaintiff has failed to demonstrate a genuine issue of fact exists as to whether P.I. and I. had any duty toward Plaintiff once the steel coils were loaded onto the flatbed and transported to Bailey's facility.  P.I. and I.'s Reply at 2-7.  P.I. and I. particularly opposes the suggestion that the wooden braces or timbers in the coil rack did not fully extend underneath the standing coil that fell, asserting there is no evidence establishing that fact, and the deposition testimony of Bailey employees establishes tampering occurred at the scene of the accident with pieces of wood and rubber matting used to prevent the steel coils from touching the flatbed moved and shifted around.  *Id.* at 4-5.  P.I. and I. asserts that no measurement was ever taken of either the steel coil that fell or the remaining three steel coils standing in the coil rack such that it is impossible to establish that the steel coil that tipped and fell injury Plaintiff Randy Zwolak was, in fact, placed on the flatbed with a portion extending unsupported over the edge of the coil rack.  *Id.* at 5-6.  P.I. and I. further argues that regardless of whether Plaintiff, routinely and without incident, had unloaded standing coils without first securing the coils with a chain, there is no question of fact

that it would have been safer for Plaintiff to secure the coil with a chain prior to cutting the bands. *Id.* at 6. According to P.I. and I., despite deposition testimony raising the question as to whether there was sufficient room permitting a C hook to fit a C hook between the coils, the undisputed fact that Bailey did not use a C hook to unload steel coils until after the accident renders the question immaterial to this case. *Id.* at 6-7.

Here, the record establishes that genuine questions of fact exist as to whether the steel coils were properly loaded, pursuant to the directions of P.I. and I. truck driver Wilson, in compliance with § 393.120, or whether there was an obvious defect in the manner in which the steel coils were loaded onto the flatbed of which P.I. and I. owed Plaintiff a duty to correct or warn, *Sprague*, 474 N.Y.S.2d at 251, as well as whether Plaintiff's action were the sole proximate cause of the accident or whether the cause can be attributed to any negligence by P.I. and I. or Bailey.

As relevant, P.I. and I. Safety Director Jeff Jenkins ("Jenkins"), gave deposition testimony describing the assembly of a coil rack as "a metal object that is laid down on the deck of the trailer to build what's called a cradle to haul steel coils." Jenkins Dep. Tr. at 10. According to Jenkins, depending on the size, especially the width, and weight of the steel coils to be loaded into a coil rack, having a steel coil extend beyond the wooden timbers may or may not be safe. *Id.* at 12-13, 15-16. Jenkins stated that when in the coil rack, whether the steel coils touch the deck of the trailer may or may not factor into whether the coils were secure. *Id.* at 14. Jenkins agreed that having a standing steel coil loaded onto a coil rack come out of the coil rack on a stopped trailer was an unusual incident which Jenkins had not previously encountered in his 18 years as a safety director within the trucking industry. *Id.* at 24, 26-27.

Ensley, who loaded P.I. and I.'s flatbed with the steel coils, explained that when unloading standing coils, if the total weight of the banded coils was too much for the receiving company to lift together, the bands would be cut allowing for each coil to be unloaded one at a time. Ensley Dep. Tr. at 38, 48-49. Generally, a crane fitted with a C hook that fits through the eye of the coils was used to unload the standing coils, regardless of whether the standing coils were lifted while banded together or one at a time. *Id.* at 38-39, 46. For safety reasons, the coil to be unloaded would be secured to the crane's C hook prior to cutting the bands because upon cutting the bands, the coils would "loosen" and "move a little bit." *Id.* at 39, 57.

Wilson testified that upon arriving at Bailey's facility, Wilson backed the flatbed to the loading dock and prepared the flatbed to be unloaded by removing the tarp, taking down the ribbing, and opening up the sides. Wilson's Dep. Tr. at 66-67. Wilson asked Plaintiff how he intended to unload the flatbed and Plaintiff explained that he would remove each of the standing steel coils one at a time by crane, lifting each coil by a chain Plaintiff would place around each of the standing steel coils. *Id.* at 68. Plaintiff planned to first use the crane to unload the standing coils from the rear coil rack, then a forklift to unload the skidded steel coils, and then the crane to unload the standing coils from the front coil rack. *Id.* at 68-69. Wilson explained that the steel coils he delivered to Bailey were typically unloaded one at a time because Bailey did not have a crane or forklift capable of lifting more than one steel coil at a time. *Id.*

Plaintiff testified at his deposition that at the time of the accident he was employed with Bailey as the warehouse lead, and supervised only David Emke

25

("Emke").  Plaintiff's Dep. Tr.[15] at 16-17.  According to Plaintiff, P.I. and I. was not the regular carrier for such deliveries, but would fill in when A-E-S, another carrier, could not make deliveries, and Phoenix was Bailey's primary source for steel, but another company was the primary source for aluminum.  *Id.* at 18-19.

Plaintiff described the specific procedure followed for unloading coils of steel and aluminum as backing the delivery truck into the building up to the loading dock's single bay so that the end of the truck was only inches from the loading dock.  *Id.* at 19-20.  Once the truck was at the loading dock, the driver would remove the tarp and sides to uncover the steel coils to be unloaded, and Plaintiff would give the bill of lading to the quality control department employee who would check the shipment for compliance with the bill of lading after which the employee would advise Plaintiff the shipment was ready to be unloaded.  *Id.* at 23-24.  The steel coils would be unloaded one at a time, starting with the coils at the back of the truck.  *Id.* at 25.  Plaintiff used an electric overhead crane operated with hand controls to unload steel coils.  *Id.* at 26.  The standing coils were secured in the coil rack with two to five chains, depending on the coils' weight, that were threaded through the eyes of the coils, hooked in a criss-cross pattern onto rails on the side of the flatbed, and then tightened with a chain binder, *i.e.*, a ratcheting system.  *Id.* at 27, 30.  The chains are removed by the truck driver after which only gravity held the steel coils in position in the coil rack.  *Id.* at 27-28, 152.  Plaintiff stated either the truck driver or the person loading the steel coils would first place the coil rack on the flatbed.  *Id.* at 28.  Plaintiff described the coil rack as consisting of two brackets measuring two to three inch wide and three inches high, connected by a ¼" thick steel

---

[15] References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition, filed as Phoenix's Exh. J, P.I. and I.'s Exh. J, and Plaintiffs' Exh. J.

band. *Id.* at 31-32.  The brackets were placed on the floor of the flatbed truck to brace

beveled lengths of wood and prevent the wood from splitting apart once the steel coils

were loaded onto them. *Id.*  The brackets were not adjustable but were a set size. *Id.*

at 32.  Plaintiff described the different bands used to secure the steel coils as consisting

of one band running around the circumference of a steel coil to prevent the coil from

unraveling. *Id.* at 32-33.  Each coil was also wrapped with three other bands through

the eye to hold each coil intact. *Id.* at 33.  At least one other band was used when two

coils were to be connected together for loading purposes, which had to be cut prior to

unloading the coils by crane. *Id.* at 33, 36-37.  Plaintiff admitted that after cutting any

bands connecting two coils together, the crane's chain would be threaded through the

coil's eye and looped back to the crane. *Id.* at 37, 40, 154, 184.  Plaintiff maintains that

he followed the procedure he was taught for removing coils and Plaintiff did not know

whether Bailey maintained any written steel coil removal policy and had never seen any.

*Id.* at 37-38.  Plaintiff also denied ever observing any other Bailey employee hook a

chain to a steel coil to be unloaded prior to cutting the band holding two coils together,

*id.* at 38, but admitted it would have been possible to do so. *Id.* at 155-56.

Plaintiff described the steel coils delivered by P.I. and I. on March 20, 2012, the

date of the accident, as standing up, 11 ½ " wide and approximately four feet tall.

Plaintiff's Dep. Tr. at 49-50.  There were four or five coils, all the same 11 ½" wide,

banded together in sets of two. *Id.* at 51-52.  The overhead crane was positioned about

three feet from the rear of the truck and Plaintiff would not position the crane directly

over the steel coils until he was ready to unload the coils because the crane's chain

would be in the way. *Id.* at 53-55.  Although the crane was at least ten feet above the

coils, the chain was only a foot above the coils so that the chain was within Plaintiff's reach and easier to attach to the coils. *Id.* at 54-55.  The crane controls dangled in the air, suspended by a wire. *Id.* at 56.  Plaintiff, without first inspecting the manner in which the steel coils were loaded into the coil rack, stood at the back of the truck facing the front of the truck, and used three foot scissors to cut the two bands closest to the driver's side holding the two coils on the driver's side of the coil rack. *Id.* at 56-57, 152. Plaintiff admitted when he was first trained to unload trucks, he would inspect the coils but never encountered any problems. *Id.*  No one from Bailey ever inspected the manner in which a load was loaded onto a truck prior to being unloaded. *Id.* at 188. The two bands were located at approximately 9:00 and 3:00 positions. *Id.* at 58.  The scissors would be inserted into the space maintained by the wooden spacer to cut the connecting bands, and Plaintiff would cut the rear or 3:00 band first, and then the front or 9:00 band. *Id.* at 58-59, 153.  On the date of the accident, Plaintiff cut the rear band connecting the two driver's side coils together, then walked to the other side of the coil rack and cut the front band, and was walking back to the rear of the truck toward the crane controls when, while passing the coil on the end of the coil rack, the coil fell on Plaintiff. *Id.* at 59-61, 153.  Plaintiff does not remember the actual accident or seeing the coil fall out of the coil rack, only that he landed underneath the driver's side of the truck near the rear wheels. *Id.* at 63, 68.  Plaintiff attributed the cause of the accident to the fact that the steel coil that fell on him was not fully supported in the coil rack, but was loaded with a portion extending beyond the coil racks' timbers, unsupported, although Plaintiff was unable to determine the distance by which the coil hung over the timbers. *Id.* at 157-61.  Plaintiff recalled that on two or three other occasions he had

unloaded standing coils similarly overhanging the coil rack without any problem.  *Id.* at 158, 162.  According to Plaintiff, he assumed that because the steel company loaded the coils onto the truck, and the driver signed for the load, the coils were properly loaded.  *Id.* at 158-59, 161.

Bailey employee Emke who was assisting Plaintiff on March 20, 2012, the day of the accident, stated that the truck driver would first unhook all the chains securing the steel coils to the flatbed prior to Bailey's employees climbing onto the flatbed to prepare the steel coils to be unloaded.  Emke Dep. Tr. [16]  at 41-42.  Although the person unloading steel coils was supposed to secure the steel coils with the logging chain prior to cutting the bands to unload them, Plaintiff failed to do so that day.  Emke Dep. Tr. at 30, 51-52.  According to Emke, had Plaintiff secured the coil with the chain prior to cutting the band, the coil would not have slipped off and fallen like it did, *id.*, but Emke thought there may not have been sufficient space on one side of the coil to permit the chain to be secured to the coil prior to cutting the band.  *Id.* at 52.  Emke explained that with the equipment Plaintiff used to unload steel coils, which included an electric crane or winch and logging chains, it was sometimes difficult to fit the chains around the individual coils if the bands were not first cut.  *Id.* at 12, 34-35.

The first standing steel coil was often difficult to unload because there was not much room for threading the chain through the eye to secure the coil, but once the first coil was removed, the other coils would loosen up and were easier to handle.  Emke Dep. Tr. at 73-74.  As soon as Plaintiff cut the band on the steel coil, the coil began tipping over the edge of the truck and Plaintiff grabbed the coil, attempting to stop the

---

[16] References to "Emke's Dep. Tr." are to the page of the transcript of David R. Emke's deposition, filed as Phoenix's Exh. O, P.I. and I.'s Exh. O, and Plaintiffs' Exh. O.

coil from falling.  *Id*. at 55-56.  Emke, who was standing at the rear of the flatbed

between the rear coil rack and the end of the flatbed, also tried to stop the coil from

falling, but was unable to do so and let go when the coil fell to avoid falling with the coil

from the truck.  *Id*. at 56, 57-58, 69.  In falling from the flatbed, the steel coil became

pinned between the truck and the loading dock such that the entire coil did not land on

Plaintiff but only that portion that had uncoiled.  *Id*. at 59.  Other Bailey employees

managed to lift the fallen steel coil off Plaintiff.  *Id*. at 61-63.

According to Emke, at the time of the accident, Bailey did not have proper

equipment for unloading steel coils, such as a C hook but, instead, threaded logging

chains through the eyes of the steel coils to secure the steel coils for unloading.  Emke

Deposition Tr. at 12, 15-17.  New equipment Bailey purchased shortly after Plaintiff's

accident, including an electric hoist and C hook, made unloading steel coils, both

standing and skidded, much easier and never required bands to be cut prior to securing

the coils with chains or the C hook. *Id*. 12-17, 35.  Emke further stated the steel coils

should not have been loaded on the flatbed in the eye to the side position, but with the

eye to the front and back of the truck, *id*. at 32-34, and that Plaintiff commented that the

standing steel coils should have been loaded with the eyes front to back.  *Id*. at 43-44.

After Plaintiff was discharged from the hospital for his injuries, Emke visited

Plaintiff who questioned why the steel coils were loaded on the coil rack overhanging

the edge of the coil rack by approximately half of the coil's width.  Emke Dep. Tr. at 77,

87, 100, 103.  According to Emke, had the steel coil been completely supported by the

coil rack, it never would have tipped over after the band was cut.  *Id*. at 77.  Other

standing steel coils Emke unloaded from similar trucks after the accident were always

loaded completely inside the coil rack with the coils standing front to back, instead of eye to the side.  *Id.* at 91, 105.

According to Wilson, P.I. and I.'s truck driver, Plaintiff cut the bands on the standing coils which caused the coils to "open up" slightly with the release of tension with the tops of the coils moving one to two inches away from the spacers and other coils while the bottom of the coils remain in place in the coil rack.  Wilson's Dep. Tr. at 76, 105-09.  Prior to the accident on March 20, 2012, Wilson, who had seen Plaintiff unload P.I. and I. trucks on at least six other occasions, had never observed Plaintiff fail to secure a standing coil with a chain to the winch prior to cutting the band on the coil. *Id.* at 78-79, 152.  In reporting the accident to Matt Croup ("Croup"), then employed as P.I. and I.'s risk manager responsible for safety responsibilities, Wilson attributed the cause of the accident to Plaintiff's failure to secure the steel coil with the chain prior to cutting the band, *id.* at 86-87, 94; Jenkins Dep. Tr.[17] at 7-8, although Wilson admits Bailey's owner blamed Wilson for the accident but did not specify why.  Wilson Dep. Tr. at 84-85.

Bailey Production Manager Raymond DeLand ("DeLand"), testified at his deposition that in his previous position as Bailey's Shipping and Receiving Supervisor, he supervised the warehouse personnel who unloaded steel coils, a task for which Bailey did not have written procedures, depending instead on on-the-job training. DeLand Dep. Tr.[18] at 6, 8-9.  According to DeLand, Bailey employees, when unloading a shipment of standing steel coils loaded eye to the side, would cut the band securing

---

[17] References to "Jenkins Dep. Tr." are to the page of the transcript of Jeff Jenkins's deposition, filed as Phoenix's Exh. L, P.I. and I.'s Exh. L, and Plaintiffs' Exh. L.

[18] References to "DeLand Dep. Tr." are to the page of the transcript of DeLand's deposition, filed as Phoenix's Exh. P, P.I. and I.'s Exh. P, and Plaintiffs' Exh. P.

the coil prior to wrapping around the coils the chain attached to the crane that lifted the coil from the coil rack.  *Id.* at 11-13, 19, 66.  DeLand denied that the bands physically prevented the coil from being secured with the chain prior to cutting the band.  *Id.* at 13. Forklifts were used to unload steel coils shipped on pallets or "skidded" with the eye to the sky.  *Id.* at 17.

After Plaintiff's accident the controls for the crane were changed from wired to wireless.  DeLand Dep. Tr. at 18.  As Emke stated, Emke Dep. Tr. at 12-17, prior to Plaintiff's accident, Bailey did not have a C hook to use in unloading steel coils, but always used a chain.  *Id.* at 19.  Within six months of the accident, Bailey obtained a C hook for unloading steel coils and since that time the C hook has always been used to unload coils because it is easier to insert the C hook than the chain between the coils. *Id.* at 21-23.  According to DeLand, however, the practice at Baileys continues to be to cut the bands securing the steel coils prior to securing the coil with a chain or C hook although there is no reason not to do so.  *Id.* at 23, 66.  When a shipment of steel coils is received at Bailey, no one within the warehouse is responsible for inspecting the load for safety compliance; rather, the load is only checked by a quality inspector for compliance with the invoice.  *Id.* at 26, 32.  DeLand could not recall another accident at Bailey's facility involving a steel coil falling from a coil rack, and confirmed the steel coil the fell weighed 5,000 lbs.  *Id.* at 73.

After the accident, DeLand investigated the accident.  DeLand Dep. Tr. at 44.  As part of the investigation, DeLand observed that the steel coil that tipped and fell must have been loaded so that it was not completely within the coil rack because the steel coil that tipped was 11 ½ inches wide, yet the remaining space on the timbers of the coil

rack "was much less than that" or 7 ½" based on measurements taken by Rod Spears ("Spears"), who also took photos of the accident scene including the steel coils that remained in the coil rack on the flatbed trailer.  *Id.* at 44-46, 49, 73.  DeLand assisted Spears in taking the measurements and the photos.  *Id.* at 53-55.  DeLand described the photographs that were presented to DeLand as exhibits at his deposition as depicting that the coils in the coil rack were not resting on the trailer's deck, but were 1 ¼" off the floor, and the remaining length of timber on which a steel coil could have been supported was between 7 ¼" and 7 ½" measured from a 2" wooden spacer that was placed on the coil rack to demonstrate for purposes of taking the photos the length of timber that remained available for the fourth coil.  *Id.* at 53-55.  DeLand believed the photographs depicted the remaining standing steel coils after the accident without any alteration and stated the photos were taken to depict how the steel coils sat on the bed of the truck at the time of the accident.  *Id.* at 56-57.  DeLand also admitted that his statement that the tipped coil was 11 ½ " wide was based on his experience that was the size of steel coils Bailey was then receiving shipped eye to the side, as well as the size of the three remaining coils in the coil rack.  *Id.* at 77.

Bailey's Manager of Manufacturing Rodney A. Spears ("Spears"), testified at his deposition that when he was Bailey's Quality Control Manager, prior to the accident, the staff he supervised were responsible for performing a quality check of steel coils delivered to Bailey's facility, but the quality check was limited to material gauge and certifications, including mechanical and physical composition, and did not include inspecting the manner in which the steel coils were loaded in the delivery truck.  Spears

Dep. Tr.[19] at 6, 8-9.  Spears confirmed that Bailey did not maintain written specifications, guidelines or procedures regarding how to safely unload steel coils delivered in the eye to the side formation.  *Id.* at 9-10.  When Bailey placed an order for steel coils, Bailey would specify the size of the materials order and the manner in which the materials were to be shipped, *id.* at 13-14, but Bailey was not involved in loading the truck.  *Id.* at 15.  Spears confirmed that it was never the practice at Bailey to secure a steel coil with a chain prior to cutting the band, and that after Plaintiff's accident, a C hook was purchased to be used when unloading standing steel coils to "improve safety," although Spears could not recall whether the C hook was obtained to avoid future accidents.  *Id.* at 16-17.  Spears did not know whether, following Plaintiff's accident, the bands on the steel coils still were routinely cut before the coils were secured with the C hook or chain for unloading, and also denied that changing the remote controls for the crane from wired to wireless facilitated the unloading of steel coils.  *Id.* at 18.

Because Spears had experience as an emergency medical technician ("EMT"), Spears was one of the first to render first aid to Plaintiff after the accident.  Spears Dep. at 19-20.  When Spears arrived at the scene of the accident, Plaintiff was on the concrete floor beside the truck with the steel coil behind Plaintiff next to the wall of the loading dock, in a standing position.  *Id.*  Plaintiff was on his elbows and knees, was bleeding from his head, and it was obvious Plaintiff's leg or ankle was broken based on the way the appendage was twisted.  *Id.*  Plaintiff was alert and accurately responded to Spears's questions designed to assess Plaintiff's consciousness.  *Id.* at 20.  Plaintiff was not moved until the ambulance arrived.  *Id.* at 20-21.  Spears recalled that he

---

[19] References to "Spears Dep. Tr." are to the page of the transcript of Rodney A. Spears's deposition, filed as Phoenix's Exh. Q, P.I. and I.'s Ehx. Q, and Plaintiffs' Exh. Q.

assisted Bailey owner John Hines ("Hines"), and Leland with taking photographs and measurements of the accident scene but was unable to specify the role each person had in the measurements and photographs.  *Id.* at 27-29.  Spears stated that the coil that tipped and fell must have measured 11 ½" in width because that was the standard size ordered for the part number.  *Id.* at 29-30.  One photo depicted the distance from the end of the coil rack to the next coil in the rack as 9" without the 2" spacer, another photo depicted the distance from the end of the coil rack to the next coil with the 2" spacer as 7", and still another photo depicted a 1 ½" gap between the bed of the truck and the bottom of a standing steel coil loaded in the coil rack.  *Id.* at 35-36.  Spears could not explain why some of the photographs showed what appeared to be a black rubber mat underneath the steel coils, while other photographs did not.  *Id.* at 36-37.  One photo showed the other row of steel coils in the second coil rack that had yet to be unloaded with a coil extending beyond the end of the timbers.  *Id.* at 37-38 and Photo Exh. 1.  Another photograph of the second row of steel coils shows the steel coils are resting on the flatbed deck, rather than suspended above the flatbed in the coil rack.  *Id.* at 40, and Photo Exh. 5.  It was Spears's opinion that the steel coil fell because the wood slats or timbers underneath the coil were not long enough to support the coil's weight and, once unbanded, the timbers acted like a "cantilever" and the coil, which was not touching the bed of the truck, fell off.  *Id.* at 42.  Based on the photographs, Spears estimated the coil extended 4" to 4 ¼" beyond the timbers, the assumption based on the coils being 11 ½ " wide, separated by 2" spacers, and the coil not resting on the bed of the truck but suspended 1 ¼" in the air.  *Id.* at 42-43.

There is thus evidence in the record sufficient to establish a genuine issue of material fact as to whether P.I. and I. negligently directed the loading of the steel coils in the coil rack such that the coil that tipped and fell was not fully supported by the coil rack, but extended several inches beyond the end of the timbers  such that the particular load of steel coils delivered to Bailey's facility on March 20, 2012, did not fully comply with § 393.120, and whether such failure allowed the coil, when the bands were cut, to expand and move, falling out of the coil rack, striking Plaintiff who then fell and was further injured when the coil fell on him.  A reasonable juror could find that such overhanging of the steel coil was an obvious defect that should have been readily apparent to the truck driver who was responsible for directing the loading of the coils and warning Plaintiff about the hazard posed by the improper loading.  *Sprague*, 474 N.Y.S.2d at 251.

Furthermore, consistent deposition testimony from Plaintiff, Emke, and Wilson that Plaintiff failed to cut the bands on the steel coils loaded in a standing position in the coil rack without first attempting to secure the coils with the chain attached to the crane, or with a C hook, raises a genuine issue of material fact as to whether Plaintiff is also at fault for the accident.  That Bailey did not then have either a C hook or written procedures establishing that its employees who unloaded deliveries of steel coils were properly trained to always secure the coils with the crane's chain or C hook, and that Bailey did not have an employee check each delivery of steel coils to ensure the manner in which the coils were loaded did not pose any risk calls into question whether Bailey was negligent.  The question of comparative liability, however, is a factual matter

for the jury, not a matter of law for resolution by the court on summary judgment.   *Yoos*, 2012 WL 177867, at * 5.   Accordingly, P.I. and I.'s Motion is DENIED.

## **CONCLUSION**

Based on the forgoing, Phoenix's motion (Doc. No. 47), is GRANTED in part and DISMISSED as moot in part; Bailey's motion (Doc. No. 52), is DISMISSED as moot, and P.I. and I.'s motion (Doc. No. 53) is DENIED.   Plaintiffs and P.I. and I. are directed to appear before the undersigned on **November 17, 2015, at 11:00 A.M.** to set a date for trial.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:        October 14, 2015
             Buffalo, New York